UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| CARLINDA P., | ) |
| Plaintiff, | ) ) ) Case No. 18 C 4009 |
| v. | ) ) Magistrate Judge Gabriel A. Fuentes |
| ANDREW M. SAUL, Commissioner of Social Security,[1] | ) ) ) |
| Defendant. | ) |

**MEMORANDUM OPINION AND ORDER**[2]

Before the Court is Plaintiff Carlinda P.'s[3] appeal from the Commissioner's decision denying her application for a closed period of Supplemental Security Income ("SSI"). (D.E. 18.) The Commissioner has moved to affirm. (D.E. 31.)

**I.   Procedural Background**

Plaintiff applied for SSI on May 4, 2010, when she was 52 years old. She first appeared at a hearing before an ALJ on December 13, 2011 (R. 59, 130), after which the ALJ wrote an opinion

---

[1] The Court substitutes Andrew M. Saul for his predecessor, Nancy A. Berry, as the proper defendant in this action under Federal Rule of Civil Procedure 25(d) (a public officer's successor is automatically substituted as a party).

[2] On July 16, 2018, by consent of the parties and under 28 U.S.C. § 636(c) and Local Rule 73.1, this case was assigned to a United States Magistrate Judge for all proceedings, including entry of final judgment. (D.E. 11.) On May 31, 2019, the case was reassigned to this Court for all proceedings. (D.E. 37.)

[3] The Court in this opinion is referring to Plaintiff by her first name and first initial of her last name in compliance with Internal Operating Procedure No. 22 of this Court. IOP 22 presumably is intended to protect the privacy of plaintiffs who bring matters in this Court seeking judicial review under the Social Security Act. The Court notes that suppressing the names of litigants is an extraordinary step ordinarily reserved for protecting the identities of children, sexual assault victims, and other particularly vulnerable parties. *Doe v. Vill. of Deerfield*, 819 F.3d 372, 377 (7th Cir. 2016). Allowing a litigant to proceed anonymously "runs contrary to the rights of the public to have open judicial proceedings and to know who is using court facilities and procedures funded by public taxes." Id. A party wishing to proceed anonymously "must demonstrate 'exceptional circumstances' that outweigh both the public policy in favor of identified parties and the prejudice to the opposing party that would result from anonymity." *Id.*, citing *Doe v. Blue Cross & Blue Shield United of Wis.*, 112 F.3d 869, 872 (7th Cir. 1997). Under IOP 22, both parties are absolved of making such a showing, and it is not clear whether any party could make that showing in this matter. In any event, the Court is abiding by IOP 22 subject to the Court's concerns as stated.

denying her application. (R. 36.) The Appeals Council denied Plaintiff's request for review, and Plaintiff appealed to the federal district court, which remanded the case to the agency for further proceedings. (R. 585-616.) On remand, a second hearing was held on November 29, 2016, after which a second ALJ issued an opinion denying Plaintiff's application for benefits. (R. 497.). The ALJ considered a closed period of disability, from April 23, 2010, through November 25, 2014.[4] (R. 532-33.) Plaintiff's request for review was denied (R. 480), making the ALJ's decision the final decision of the Commissioner. *Prater v. Saul*, 947 F.3d 479, 481 (7th Cir. 2020).

## II.  Factual Background

On December 4, 2007, Plaintiff was admitted to the hospital after overdosing on ibuprofen and Vicodin; she also had cocaine in her system. (R. 250, 256.) She was transferred to an inpatient mental health center, where she was diagnosed with depressive disorder and substance-induced mood disorder. (R. 262-64.) Plaintiff was discharged five days later at the request of her family after her father died suddenly. (R. 264-65.) In January 2008, Plaintiff began outpatient therapy with Robert Galligan, Psy.D. (R. 291.) He diagnosed her with moderate major depression and assigned Plaintiff a Global Assessment of Functioning ("GAF") score of 52.[5] (R. 305.) He noted that Plaintiff felt guilty about her father's death, "as if she is to blame" (R. 293), and her concentration was "adversely affected by her habitual worry." (R. 299.) In February 2008, she was prescribed Prozac (antidepressant). (R. 308-09.)

On April 23, 2008, Harley G. Rubens, M.D., performed a state agency psychiatric examination. Plaintiff reported that she usually spent the day watching television or visiting her

---

[4] The closed period begins on April 23, 2010 because SSI benefits are not payable until the month after the application's filing date. 20 C.F.R. § 416.335. The closed period ends on November 25, 2014 period because Plaintiff received benefits beginning on that date as a result of a subsequent, successful disability claim. (R. 619.)

[5] A GAF score between 51 and 60 indicates moderate functional impairment. *See* Am. Psych. Assoc. Diagnostic & Statistical Manual of Mental Disorders at 34 (4th ed. rev. 2000) (DSM-IV) The DSM-V has since replaced the GAF with another metric. *See Walker v. Berryhill*, 900 F.3d 479, 480 (7th Cir. 2018).

mother's downstairs apartment, and she was worried because she had to move to a different neighborhood. (R. 314.) Dr. Rubens diagnosed Plaintiff with adjustment disorder with mixed anxiety and depression and dependent personality disorder; he noted Plaintiff "has always been dependent on her mother, sisters or other family members to take care of her." (R. 316.) Indeed, during the summer of 2008, Plaintiff had trouble adjusting to her new apartment and the separation from her family. She told Dr. Galligan that she was stressed by "the prevalence of drugs and gangs around her own apartment." (R. 337-38, 341.) Plaintiff could not afford her medication, so Dr. Galligan gave her free samples of Lexapro (antidepressant). (R. 339.)

Plaintiff next saw Dr. Galligan in October 2009. (R. 319.) She had been more depressed; she felt her apartment was in an unsafe neighborhood, and she was feeling isolated from her family. (*Id.*) Dr. Galligan opined that Plaintiff's fear about being in an unsafe area "may be contributing to a general state of paranoia." (*Id.*) On November 4, 2009, Plaintiff underwent an evaluation with psychiatrist Robert A. Channon, M.D. (R. 323.) Plaintiff told him that she rarely left her home, cried easily, and "does not care if she lives or dies." (*Id.*) Dr. Channon diagnosed Plaintiff with major depression and instructed her to take Lexapro. (*Id.*)

On April 14, 2010, Plaintiff told Dr. Channon that she was depressed and had cut herself on four separate occasions, once intending to kill herself. (R. 322.) Dr. Channon again prescribed Prozac and instructed Plaintiff to use a prescription discount program. (*Id.*) The following month, Plaintiff told Dr. Channon she had been unable to fill her prescription due to financial problems, and he gave her free samples of Lexapro to tide her over until she could get Prozac. (R. 400.)

On June 17, 2010, Ana A. Gil, M.D., performed a state agency psychiatric examination. Plaintiff told Dr. Gil she could not travel by herself because she gets lost and nervous outside. (R. 356.) She reported that Prozac helped her depression, but she could not afford it, and she

3

sometimes missed appointments with Dr. Galligan because she did not have carfare. (*Id.*) Plaintiff described feelings of hopelessness and increased social isolation; she did not have friends or hobbies. (R. 357-58.) Dr. Gil found Plaintiff had "mild psychomotor agitation, a sad, tearful and restricted affect and moderately depressed mood," and impaired immediate memory. (R. 359.) Based on Dr. Gil's exam, a state agency consultant opined Plaintiff had moderate difficulties in maintaining social functioning and maintaining concentration, persistence or pace and mild restriction in activities of daily living ("ADLs"). (R. 384.)

In August 2010, Dr. Channon increased Plaintiff's dose of Lexapro because she felt she could not "handle all this stress" from financial and other difficulties. (R. 398.) In September, he added a prescription for Seroquel (antipsychotic). (R. 396.) That month, Dr. Galligan noted Plaintiff appeared sullen and distracted, and she acknowledged an "intensification of depression and anxiety;" however, she "seem[ed] to be coping marginally adequately with the aid of medication." (R. 395, 397.) Plaintiff remained "hypervigilant in her apartment because she worrie[d] that something bad might happen." (*Id.*) Dr. Galligan also completed a medical source statement, writing Plaintiff showed "only transient, moderate improvement" and "remain[ed] depressed [and] poorly functioning," with feelings of guilt and anxiety, difficulty concentrating, persistent disturbance in mood or affect and emotional withdrawal and lability. (R. 388-89.) Dr. Galligan noted he saw Plaintiff "very infrequently," and he gave her a GAF score of 53. (R. 388.)

In December 2010, Plaintiff was tearful and blaming herself on the anniversary of her father's death; Dr. Channon told her to monitor herself for suicidality and increased her dose of Seroquel. (R. 428.) Two weeks later, Plaintiff told Dr. Channon she was "feeling better" because she had been "mostly occupied or watched" looking after her grandchildren. (R. 425.) Dr. Channon again increased Plaintiff's dose of Seroquel. (*Id.*) In January 2011, he noted Plaintiff was "not

4

feeling so urgently suicidal," but had "persistent anxiety/discomfort leaving the house except for absolute necessity." (R. 422.)

In March 2011, Plaintiff told Dr. Channon her mood had been "good for several weeks" (R. 416), but in April, she was more depressed, and she was looking after her grandchildren to "distract her from depression and [suicidal ideations]." (R. 412.) Plaintiff was upset about drug dealing near her home and felt "people may be watching her," and she admitted to "stretch[ing]" out her medications over the past two weeks. (*Id.*) Plaintiff also saw Dr. Galligan in April 2011; he noted their therapy sessions were "infrequent," and Plaintiff seemed to be "leading a fairly isolated, minimally functional life." (*Id.*)

In June 2011, Plaintiff told Dr. Channon she was experiencing "ongoing paranoia;" she kept her blinds and windows closed. (R. 406.) Since she said she was unable to afford out-of-pocket medical expenses, Dr. Channon gave her samples of Cymbalta (for depression and anxiety). (*Id.*) In July, Plaintiff reported Cymbalta may have decreased her paranoia and anxiety but in August, Plaintiff felt physically ill and depressed. (R. 458.) Dr. Channon instructed her to continue taking Seroquel and gave her samples of Viibryd (antidepressant) because he had no samples of Lexapro or Cymbalta. (*Id.*) In September, Plaintiff told Dr. Channon her mood was "okay"; at her request, Dr. Channon put her back on Cymbalta. (R. 465.)

On December 13, 2011, Plaintiff appeared at her first hearing before an ALJ. She testified that her medications kept her from being suicidal and improved her sleep. (R. 72.) Plaintiff testified she did not like being around anyone, even family; she thought people were out to get her, and she stayed in her house except when visiting her mother or the doctor. (R. 72-73, 76-78.) When her daughter worried Plaintiff was thinking about suicide, she sent the grandkids over (ages 4 and 10) and Plaintiff stayed inside with them. (R. 84-88.) An independent medical expert agreed with the

5

2010 state agency opinion finding Plaintiff had moderate and mild restrictions in the paragraph B criteria, taking into account gaps in treatment with Dr. Galligan and evidence that Plaintiff's condition improved when she took her medication. (R. 99-100.)[6]

On December 16, 2011, Dr. Channon noted Plaintiff looked subdued; she was having suicidal thoughts related to the anniversary of her father's death, so she planned to stay with her mother while she felt that way. (R. 1100.) In January 2012, Plaintiff was depressed but no longer suicidal. (R. 1097.) In February, Dr. Channon described her as "alert but weary and concerned about her medical status," including a recurrence of thyromegaly (enlargement of the thyroid gland). (R. 1094.) In March 2012, Plaintiff resumed therapy with Dr. Galligan. He found Plaintiff in a "relatively good mood" but worried the warmer weather would bring more violence to her neighborhood and "extremely self-conscious about her appearance because of her need for dental work" (R. 1090.) In April, Plaintiff was tearful and upset at her doctor appointments because her mother had had a heart attack and her aunt had died. (R. 1087.)

In June 2012, Plaintiff seemed exhausted from all her family health issues, but Dr. Galligan found she was in a "better mood." (R. 1083.) That month, Dr. Channon noted Plaintiff had been "without meds for two weeks," and he prescribed her Pristiq (antidepressant) and instructed her to resume taking her medications. (R. 1083-85.) In July and August, Dr. Galligan noted Plaintiff was doing better, though she was worried about her mother and daughter and remained "nervous in her current apartment, because so much activity goes on outside her windows." (R. 1075, 1078.)

In October 2012, however, Drs. Channon and Galligan found Plaintiff tearful, upset and overwhelmed by her mother's deteriorating health and her daughter's apparent development of a psychotic illness. (R. 1074-75.) Plaintiff feared her mother's death, stating "I don't know what I

---

[6] The ALJ subsequently issued an opinion denying benefits based on medical evidence through December 2011.

will do without her. I have already lost my father." (R. 1074.) Family medical "disasters" continued to upset Plaintiff in November and December 2012. (R. 1069.) In January 2013, Dr. Galligan found Plaintiff's mood improved (R. 1062), but Dr. Channon opined her depression was worsening, and she appeared disheveled and depressed. (R. 1063-64.)

Plaintiff returned to Dr. Galligan on June 27, 2013, grieving the death of her mother, whose funeral had taken place the previous week, and her sister, who died in February 2013. (R. 1051.) In July 2013, Plaintiff told Dr. Channon that she felt "everybody is dying;" she was crying, not sleeping or eating, and had been "without meds for months." (R. 1044.) Plaintiff's mood was depressed and anxious and her judgment and insight were limited, but her affect was stable and appropriate. (*Id.*) Dr. Channon found Plaintiff's depression was worsening and told her to resume her medications. (R. 1045.) Dr. Galligan noted Plaintiff "seems to benefit from the opportunity to express her feelings" and found she was suffering "an intensification of depression." (R. 1042-43.)

On July 24, 2013, Dr. Galligan completed another medical source statement, noting Plaintiff had been coming for sessions more regularly. (R. 474.) He gave Plaintiff a GAF of 52 and indicated her psychiatric symptoms included feelings of guilt or worthlessness, persistent anxiety, difficulty thinking or concentrating, persistent disturbances of mood or affect, emotional withdrawal, easy distractibility, memory impairment and sleep disturbance. (R. 474-75.) Dr. Galligan opined Plaintiff would be unable to meet competitive work standards in the areas of maintaining attention, attendance (she would miss more than four days of work per month), working near others, performing at a consistent pace, dealing with normal work stress, and understanding, remembering and carrying out detailed instructions, and Plaintiff was seriously limited but not precluded in all other work-related mental abilities and aptitudes. (R. 476-79.)

7

In August 2013, Dr. Galligan noted Plaintiff "was mildly agitated," but "seem[ed] to be doing fairly well" despite not having taken her medication the past week. (R. 1039.) In September 2013, Plaintiff told Dr. Channon she was in a better mood because she got new dentures. (R. 1035.) However, she was still grieving her mother's death, and her judgment and insight were limited and her mood was dysphoric. (*Id.*) In October 2013, Plaintiff told Dr. Galligan she was more depressed, in part because she did not have her medications. (R. 1031.) In December, Plaintiff reported continued sadness and told Dr. Channon she was more socially isolated for fear of going out. (R. 1024.) Dr. Channon assessed that her depression was unimproved. (R. 1025.)

In January 2014, Plaintiff was still sad and bereaved, but she was enjoying a new puppy and Dr. Channon assessed her depression as "stable." (R. 1019-20.) Dr. Galligan noted Plaintiff was more optimistic about her future, though still worried about her neighborhood. (R. 1018.) In February and April 2014, Plaintiff's depression continued unimproved (R. 1010, 1015), and Dr. Channon restarted Plaintiff on Prozac. (R. 1010.) Drs. Channon and Galligan both noted improvement in Plaintiff's mood in May 2014, though she spent a lot of time in her apartment because she felt her neighborhood could be dangerous. (R. 1002-03.)

In July 2014, Dr. Channon found Plaintiff's depression had worsened, and she had developed psychosis (disconnection from reality). (R. 999.). She reported delusions of paranoia; Plaintiff was "hiding" in her home and not even walking her dog because she felt "[s]omeone [was] watching" her. (R. 998.) Dr. Channon increased her Seroquel dose, but Plaintiff's condition still worsened. (R. 989.) In August, she was still "mostly hiding" and rarely left the house (R. 989); she was depressed, anxious and not eating. (R. 982.) Dr. Channon switched Plaintiff to a new antidepressant, mirtazapine, and continued her on Seroquel. (R. 982-83.) In October and November 2014, Plaintiff was also worried about her daughter's recent multiple sclerosis

8

diagnosis; Dr. Channon found Plaintiff's depression was worsening (R. 980-81), though Dr. Galligan opined that Plaintiff was "coping well" with her daughter's illness. (R. 968-69.)[7]

### III. Hearing Testimony

On November 29, 2016, Plaintiff appeared at a hearing before a second ALJ. She testified that she was grieving the loss of her aunt, sister, mother, and daughter (who died in the last year), and she had been thinking about killing herself. (R. 534-35.) Plaintiff had trouble focusing on the ALJ's questions, repeatedly saying she wished she were dead. (R. 536-37, 554.) Plaintiff said she had not "been right since" her father died; she thought people were watching her so she kept her blinds closed and had trouble sleeping for fear someone would break into her house (which never happened). (R. 538, 543-44, 554, 557.) She was afraid to go outside because of drugs and shooting in her neighborhood, and she tried to avoid being near other people. (R. 549-51, 557.)

Psychologist Michael C. Rabin, Ph.D., an independent medical expert, testified next; he only had access to medical records from April 2010 to November 2011 and Dr. Galligan's 2013 medical source statement.[8] (R. 564.) Dr. Rabin noted that the record from this time was "very sparse" and had "a lot of gaps." (R. 565.) He opined that Dr. Galligan's 2010 and 2013 medical source statements, which indicated Plaintiff had some severe mental impairments, were inconsistent with the evidence from 2010 to 2011, which showed Plaintiff had "only" moderate depression and attended therapy irregularly. (R. 564-68.) Dr. Rabin noted that Drs. Galligan and Channon saw evidence of dependent and borderline personality traits but did not diagnose Plaintiff with paranoia. (R. 569-70.) He opined Plaintiff had moderate restriction in ADLs and in concentration, persistence, and pace, and moderate to marked difficulties in social functioning, and

---

[7] As Plaintiff received benefits based on a separate SSI application as of November 25, 2014, the Court ends its discussion of the medical record here.
[8] Plaintiff's attorney submitted the post-2011 medical records within 14 days after the hearing. (R. 531-32.)

9

could perform jobs involving simple and routine work with no social demands, no contact with the general public, no team or tandem work, and only superficial contact with supervisors and peers. (R. 566.) Based on a hypothetical with these and other mental restrictions (no fast-paced or timed production line tasks and only relatively static work settings), the vocational expert testified that several jobs would be available in the national economy. (R. 571-72.)

### IV. ALJ's Decision

On February 15, 2017, the ALJ wrote an opinion finding Plaintiff was not under a disability within the meaning of the Social Security Act from April 23, 2010, the application date, through November 25, 2014. (R. 520.) The ALJ determined Plaintiff had the severe impairments of major depressive disorder and personality disorder, but that her impairments did not meet or medically equal a listed impairment.[9] (R. 502-03.)

Applying the "paragraph B" criteria, the ALJ found Plaintiff had mild limitations in understanding, remembering or applying information because her "treating providers indicate the claimant has no difficulty understanding treatment recommendations, maintaining conversation in the treatment setting, or asking appropriate questions," and at the hearing, Plaintiff "answered questions appropriately [and] there was no evidence of apparent difficulties understanding and attending to the content of the hearing." (R. 504.) The ALJ found moderate limitations in Plaintiff's ability to interact with others, because Plaintiff "described daily and consistent interactions with her family, and ongoing situational stressors for her regarding her family members' difficulties," despite indicating that she does not socialize or spend time with others. (*Id.*) Further, the ALJ stated that Plaintiff has not "reported specific incidents of difficulty with social anxiety or other social difficulties . . . during the applicable time period." (*Id.*) The ALJ also assessed moderate

---

[9] The ALJ found Plaintiff's alleged thyroid condition, asthma and history of cocaine use were not severe because there was no evidence Plaintiff needed treatment for these conditions during the relevant time period. (R. 503.)

10

limitations in Plaintiff's ability to concentrate, persist or maintain pace, and adapt or manage herself, relying primarily on the state agency consultative examinations from 2008 and 2010 (R. 504-05), which the ALJ found were "generally consistent with the weight of the evidence." (R. 516.) The ALJ found Plaintiff was "able to maintain concentration and persistence to manage daily tasks including personal hygiene and household chores, as well as to care for family members, both ill adults as well as healthy misbehaving children." (R. 504-05.)

The ALJ assigned Plaintiff the residual functional capacity ("RFC") to perform unskilled work at all exertional levels, with the non-exertional limitations she included in her hypothetical to the VE at the hearing. (R. 506.) The RFC was based on the testimony of Dr. Rabin, whose assessment the ALJ gave "great weight" because the ALJ found it "generally consistent with the weight of the objective medical record throughout the applicable time period." (R. 515.) The ALJ was not concerned that Dr. Rabin did not have post-2011 mental health treatment records, finding the later records "do not reflect a significant change compared to the records available at the time of the hearing, and would not substantially change the opinion of the medical expert." (*Id*.)

By contrast, the ALJ gave little weight to Dr. Galligan's medical source statements from September 2010 and July 2013. (R. 516.) First, the ALJ noted that Plaintiff infrequently saw Dr. Galligan before 2012. (*Id*.) Second, the ALJ found Dr. Galligan's treatment notes did not support extreme limitations because they showed: "variable symptoms, with most more severe symptoms resolving within several months per his notes," moderate major depressive disorder, and "generally reflect[ed] she is coping with her losses, often reflects improvement, and mental status exams are largely intact, with intact attention and concentration noted on mostly all the exams." (R. 516-17.) Third, the ALJ found Plaintiff's ability to care for her grandchildren, daughter and ill mother and live independently was not consistent with the restrictions set forth by Dr. Galligan. (R. 517.)

11

The ALJ described Plaintiff's treatment as "conservative" and noted she had gaps in her treatment with Dr. Galligan and problems complying with her medications. (R. 512, 515.) The ALJ found Plaintiff's increased depressive symptoms correlated with times she was out of medications. (*Id*.) The ALJ stated that she considered Plaintiff's "explanations for not complying" with treatment (noting at one point Plaintiff's claim of "financial difficulties" filling her prescriptions (R. 511)), but the ALJ was unconvinced because Plaintiff did not pursue "a low-cost or free clinic" or "prescription discount programs," as her doctor had recommended. (R. 507-08.)

The ALJ "note[d] the claimant's symptoms are highly variable," but concluded that "even when she is depressed her symptoms appear relatively manageable, and still consistent with the ability to perform work." (R. 508.) The ALJ found Plaintiff's depression was "well-managed" with medications, and she cited records where Plaintiff was in an "improved" or "good" mood, "appeared stable despite dealing with the fears and problems," and was "getting along marginally adequately with the aid of medication." (R. 510-15, 517.) The ALJ also emphasized Plaintiff's ability to "car[e] for her young grandchildren and helping her daughter, suggest[ing] much better functionality than alleged during the relevant time period." (R. 512.)

In addition, the ALJ attributed Plaintiff's "exacerbated symptoms and difficulties emotionally" to what the ALJ called "significant situational stressors," which the ALJ stated "cannot be considered as a factor in determining eligibility for benefits." (R. 512-13.) The ALJ acknowledged Dr. Channon's June 2011 notes indicated Plaintiff "had ongoing paranoia, did not open the windows, and kept the blinds down due to having a 'feeling'" (R. 513), and that in July 2014 she "hired a dog walker because she was afraid in her neighborhood." (R. 515.) However, the ALJ concluded that Plaintiff's "'paranoia' as described by Dr. Channon does not seem particularly ill-founded nor based in mental health etiology, given she lives in a high-crime

12

neighborhood, and she has reported suspicious incidents[,]" and Plaintiff's mental examinations "showed no indication of abnormal perception." (R. 513, 515.) The ALJ found that "these situational stressor[s] . . . provide a rather legitimate basis for the claimant's fears in her neighborhood, rather than unfounded paranoia" (R. 513), and that medical records show "periods where [Plaintiff] was reported to be doing well and coping with her situational stressors." (R. 515.) The ALJ also referred to Plaintiff's stress about family members' illnesses and deaths as "situational stressors," and found Plaintiff "continued to cope with the stressors without significant decompensation" and "adequately cop[ed] with her grief." (R. 513-14.) Although Plaintiff's grief and depression increased after her mother died, the ALJ noted that Plaintiff's doctors indicated she had been out of medications and not taking care of herself. (*Id*.)

Ultimately, the ALJ concluded that Plaintiff was unable to perform any past relevant work, but that as the VE testified, jobs existed in significant numbers in the national economy that Plaintiff could have performed with her RFC. (R. 519.)

**V.    Discussion**

The Court's review of the ALJ's decision "is deferential; we will not reweigh the evidence or substitute our judgment for that of the ALJ." *Summers v. Berryhill*, 864 F.3d 523, 526 (7th Cir. 2017). "The ALJ's decision will be upheld if supported by substantial evidence, which means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Jozefyk v. Berryhill*, 923 F.3d 492, 496 (7th Cir. 2019) (internal citations and quotations omitted). "An ALJ need not address every piece of evidence," but must "build an accurate and logical bridge" between the evidence and his conclusion. *Lanigan v. Berryhill*, 865 F.3d 558, 563 (7th Cir. 2017). Here, Plaintiff offers numerous reasons to reverse and remand the ALJ's decision. For the reasons that follow, we agree that reversal and remand is necessary here.

### A.     ALJ Inadequately Addressed Plaintiff's Symptoms of Paranoia and Psychosis

The ALJ minimized evidence of Plaintiff's symptoms of paranoia and psychosis in several ways. The ALJ called Plaintiff's symptoms of fear and isolation -- mentioned specifically as symptoms of paranoia in the medical record at least as early as 2011 -- "situational stressors" and declined to weigh them in her disability analysis. However, an ALJ may not conclude on her own that a claimant's "symptoms were just a response to situational stressors as opposed to evidence of depression" or other mental impairment. *Larson v. Astrue*, 615 F.3d 744, 751 (7th Cir. 2010). Unlike the ALJ, plaintiff's physicians did not simply write off Plaintiff's paranoid behavior because it escalated due to Plaintiff's fear of her neighborhood and anxiety over her family tragedies, and the ALJ was not entitled to do so on her own. Indeed, as Plaintiff points out, there is no evidence that her fears are proportionate to the threats of her neighborhood. (Pl.'s Br. at 10.)

Instead, Plaintiff's treating physicians found her fears and anxieties were contributing to her leading an isolated, minimally functional life, and Dr. Channon attempted to address Plaintiff's paranoia by increasing her prescription for Seroquel, which is an anti-psychotic medication, and ultimately diagnosing Plaintiff with psychosis in July 2014. However, the ALJ failed to mention that Plaintiff had been taking anti-psychotic medication for years, or that she was diagnosed with psychosis and suffering paranoid delusions in July 2014. The ALJ's failure to address this material evidence was error, as it is well-settled that "[a]n ALJ cannot simply cherry-pick facts supporting a finding of non-disability while ignoring evidence that points to a disability finding." *Reinaas v. Saul*, 953 F.3d 461, 466 (7th Cir. 2020) (internal quotations omitted).

Second, the ALJ erred in determining that Plaintiff was "adequately" coping with her so-called situational stressors based on certain medical visits at which she appeared "improved" or "better" or even "good." This too constituted impermissible cherry-picking, in light of the many

14

documented instances where Plaintiff appeared to be struggling with her psychosis and depression and was far from "good." In addition, it is well-settled that "symptoms that wax and wane," where a person has "better days and worse days," are not inconsistent with a person who has a chronic psychiatric disease and is under continuous treatment for it with heavy drugs. *Larson*, 615 F.3d at 751; *Bauer v. Astrue*, 532 F.3d 606, 609 (7th Cir. 2008); *see also Lanigan v. Berryhill*, 865 F.3d 558, 564 (7th Cir. 2017) (citing *Larson* and *Bauer*). The ALJ's failure to account for Plaintiff's worse days requires remand.

      **B.**     **ALJ Improperly Assessed the Medical Opinion Evidence[10]**

The ALJ's decision to give "great weight" to the opinion of the non-examining medical expert but "little weight" to Dr. Galligan's opinions was not supported by substantial evidence. "The most fundamental error is that the ALJ accepted [Dr. Rabin's] opinions without recognizing the limits that [he] himself imposed on them." *Plessinger v. Berryhill*, 900 F.3d 909, 915 (7th Cir. 2018). In this case, the limitation was huge: Dr. Rabin did not have access to any evidence post-2011, which included many instances of deterioration in Plaintiff's symptomology as well as Dr. Channon's diagnosis in July 2014 of psychosis and paranoid delusions. The ALJ briefly addressed this issue, concluding broadly that the later records "do not reflect a significant change compared to the records available at the time of the hearing, and would not substantially change the opinion of the medical expert." (R. 515.) This conclusion was not supported by substantial evidence because later medical records suggested that Plaintiff's symptoms were becoming worse and that her work-related limitations were increasing.

---

[10] The Government's contention that Plaintiff failed to raise and thus waived any challenge to the ALJ's assessment of the ME's opinion or Dr. Galligan's opinion (D.E. 32, Gov's Mem. at 9) overlooks Plaintiff's arguments on these issues. (*See* Pl.'s Mem. at 9-11.)

15

In addition, the ALJ did not adequately assess Dr. Galligan's opinions. As Plaintiff filed her application for benefits before March 27, 2017, the "treating physician rule" applies, whereby ALJs must give "controlling weight" to a treating physician's opinion if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with other substantial evidence." *Burmester v. Berryhill*, 920 F.3d 507, 512 (7th Cir. 2019) (quoting 20 C.F.R. § 404.1527(c)(2)). If the ALJ does not give a treating physician's opinion controlling weight, the ALJ must consider the following factors in deciding what weight to give the medical opinion: the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, the supportability and consistency of the medical opinion with the record, and the physician's specialization. 20 C.F.R. § 404.1527(c)(2)(i)-(ii) and (c)(3)-(5). Under the treating physician rule, an ALJ's failure to sufficiently address the relevant regulatory considerations in declining to afford a treating physician opinion controlling weight requires remand. *Reinaas*, 953 F.3d at 465-66.

Here, the ALJ purported to consider the frequency of examination in Dr. Galligan's treating relationship with Plaintiff, but the ALJ's analysis came up well short. The ALJ repeatedly faulted Plaintiff for gaps in her treatment relationship with Dr. Galligan, which Dr. Galligan noted in his 2010 medical source statement, but the ALJ failed to adequately consider the evidence of Plaintiff's more regular treatment with Dr. Galligan after 2011. In addition, the ALJ did not adequately address the length, nature and extent of Plaintiff's treating relationship with Dr. Galligan, which despite some gaps, extended from 2008 through the entire period at issue here.

Moreover, the ALJ's determination that Dr. Galligan's treatment notes were inconsistent with his medical source opinion was based on the aforementioned cherry-picked evidence and misunderstanding of the import of "variable" or waxing and waning symptoms. (R. 516-17.) Far

16

from being inconsistent with the medical record, Dr. Galligan's opinions were generally consistent with the treatment notes of Plaintiff's other treating physician, Dr. Channon, who also treated Plaintiff throughout the duration of the relevant time period. The ALJ's inadequate evaluation of Plaintiff's treating physician's reports and opinions thus also requires remand.[11]

## CONCLUSION

For the foregoing reasons, the Court grants Plaintiff's request for remand (D.E. 18) and denies the Commissioner's motion to affirm. (D.E. 31.)

                **ENTERED:**

*[signature]*

**Gabriel A. Fuentes**
**United States Magistrate Judge**

**DATED:   January 27, 2021**

---

[11] On remand, the ALJ should also revisit her reasons for finding Plaintiff's ADLs and occasional noncompliance with medications to be inconsistent with Dr. Galligan's opinions and Plaintiff's allegations. Although the ALJ appeared to consider Plaintiff's reported difficulty affording medication, the ALJ's reasons for minimizing this difficulty makes unsupported assumptions. The ALJ found probative the fact that Plaintiff did not seek treatment at a free or low-cost clinic or participate in a prescription discount program, but the ALJ did not ask about these alternatives, and there is no evidence in the record beyond Dr. Channon's suggestion that Plaintiff look into such programs. (R. 507.) In addition, the Court notes that the ALJ's determination that Plaintiff's ability to care for her grandchildren was inconsistent with the restrictions in Dr. Galligan's opinions ignores evidence that Plaintiff's daughter had her watch the grandchildren in order to distract her from suicidal thoughts. The ALJ should address these issues on remand.